**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL NEUBERGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAYA INC., DAVID BAAZOV, and DANIEL SEBAG,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Michael Neuberger ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Amaya Inc. ("Amaya" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Amaya; and (c) review of other publicly available information concerning Amaya.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Amaya securities between June 8, 2015 and March 22, 2016, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Amaya is a provider of technology-based products and services in the global gaming and interactive entertainment industries. The Company operates through two segments, Real-Money Online Poker, and Real-Money Online Casino and Sportsbook. It owns and operates gaming and related interactive entertainment businesses under the PokerStars, Full Tilt, BetStars, StarsDraft, European Poker Tour, PokerStars Caribbean Adventure, LatinAmerican Poker Tour, and Asia Pacific Poker Tour brand names.

3. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company's CEO was engaged in an insider trading scheme that involved influencing the market price of the Company's securities and communicating privileged information to third parties; (2) the Company lacked adequate internal controls; and, (3) that, as a result of the foregoing, Defendants' statements about Amaya's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

4. On March 23, 2016, news outlets reported that Amaya's Chief Executive Officer ("CEO"), David Baazov, was charged with insider trading by Quebec securities regulators. *Bloomberg Business* reported that the charges included "allegations of 'aiding with trades while in possession of privileged information,' influencing or attempting to influence the market price of securities of Amaya, and communicating privileged information . . . ."

5. On this news, Amaya's stock fell $3.07 per share, or more than 21%, to close at $11.18 per share on March 23, 2016, on unusually heavy trading volume.

6. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)), as the Company's stock trades on the The Nasdaq Global Select Market, located within this District.

10. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Amaya common shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12. Defendant Amaya is a Canadian corporation with its principal executive offices located at 7600 Trans Canada Hwy., Pointe-Claire, Quebec, Canada, H9R 1C8.

13. Defendant David Baazov ("Baazov") was, at all relevant times, CEO of Amaya.

14. Defendant Daniel Sebag ("Sebag") was, at all relevant times, Chief Financial Officer ("CFO") of Amaya.

15. Defendants Baazov and Sebag are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Amaya's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

16. Amaya is a provider of technology-based products and services in the global gaming and interactive entertainment industries. Amaya has two operating segments within its Business-to-Consumer business: real-money online poker and real-money online casino and sportsbook.

**Materially False and Misleading**
**Statements Issued During the Class Period**

17. The Class Period begins on June 8, 2015. On that day, the Company issued a press release announcing that the Company's common shares would commence trading on The Nasdaq Global Select Market. The press release also touted the Company's business. Therein, the Company, in relevant part, stated:

> Amaya is a leading provider of technology-based solutions, products and services in the global gaming and interactive entertainment industries. Amaya owns gaming and related consumer businesses and brands including PokerStars, Full Tilt, the European Poker Tour, PokerStars Caribbean Adventure, Latin American Poker Tour and the Asia Pacific Poker Tour. These brands collectively form the largest poker business in the world, comprising online poker games and tournaments, live poker competitions, branded poker rooms in popular casinos in major cities around the world, and poker programming created for television and online audiences. PokerStars is the world's most popular and successful online poker brand. Amaya also provides B2B interactive gaming solutions to the regulated gaming industry.

18. Amaya's Corporate website features a "Code of Business Conduct," (the "Code") adopted by the Company on or around May 12, 2015 and available at: http://www.amaya.com/pdf/amaya-code-of-business-conduct-may-2015.pdf. The Code states that, "Compliance with the provisions of this Code is mandatory for all employees, officers and directors of the Company." The Code further provides that employees, officers and directors, "shall not use their status or position with the Company to obtain personal gain in any manner." And, that, "Employees, officers and directors must safeguard the Company's Confidential Information," and, "Employees, officers and directors are prohibited from disclosing Confidential Information or other information which might impair the Company's competitive position or which might violate private rights of individuals, enterprises or institutions without appropriate authorization. . . Securities laws contain prohibitions against trading in securities of the Company while in possession of material information regarding the Company that has not

been generally disclosed to the public and against informing others of such undisclosed material information."

19. On August 13, 2015, Amaya issued a press release entitled, "Amaya Reports Second Quarter 2015 Results." Therein, the Company, in relevant part, stated:

> **MONTREAL, Canada, August 13, 2015 – Amaya Inc.** ("Amaya" or the "Corporation") (TSX: AYA; NASDAQ: AYA) today reported its financial results for the three and six-month periods ended June 30, 2015. Unless otherwise noted, all references to "$" and "CAD" are to the Canadian dollar, "US$" and "USD" are to the U.S. dollar and "€" and "EUR" are to the Euro. "This was another exciting quarter for Amaya," said David Baazov, Amaya's Chairman and CEO. "Our core poker business remains strong and our customers have embraced our expansion into non-poker offerings.
>
> "We've completed our transition to a pure B2C technology company having finalized the divestiture of our B2B businesses," added Baazov. "We substantially reduced our leverage and improved our financial condition. Since the acquisition of our B2C business, we've repaid approximately US$529 million of our longterm debt, thereby eliminating an estimated US$62 million of related interest expense."
>
> **Key Q2 2015 Financial Highlights**
>
> - Revenues grew 10% to approximately $320 million as compared to pro-forma revenues for Q2 2014 of approximately $289 million.
>     - Revenues grew approximately 24% on a constant currency basis and normalizing the impact of approximately $6 million in value added taxes ("VAT") charged in 2015 (but not in 2014) in certain European Union jurisdictions, including Germany and France. On the same basis, poker grew approximately 11%, partially attributable to an increase in real-money unique players and depositors on *PokerStars*.
>     - Online casino comprised approximately 11% of revenues, with the remainder almost entirely from poker.
> - Adjusted EBITDA grew 24% to $138 million, or 43.5% of revenues, as compared to pro-forma Adjusted EBITDA for Q2 2014 of approximately $112 million, or 38.5% of revenues.
>     - Adjusted EBITDA year-over-year margin expansion was driven primarily by the increase in high margin revenue streams, including online casino, despite a material decline in the value of global currencies as against the USD and the introduction of new gaming duties and VAT (totaling approximately $10 million) not in effect during Q2 2014.
> - Adjusted Net Earnings grew 43% to $86 million as compared to pro-forma Adjusted Net Earnings for Q2 2014 of approximately $60 million.

- Adjusted Net Earnings per Diluted Share grew 43% to $0.43 as compared to pro-forma Adjusted Earnings per Diluted Share for Q2 2014 of approximately $0.30.

* * *

**Key Q2 2015 Operational Highlights**

- The Corporation's B2C business added an aggregate of 1.9 million customer registrations during the quarter, with registered customers totalling more than 95 million as of June 30, 2015. Approximately 5.7 million of such total registered customers were active during the quarter.
- The aggregate number of unique customers who played a real money online offering during the quarter was approximately 2.3 million, of which approximately 95% played on PokerStars, in line with Q2 2014.
- Gross deposits increased approximately 4% on a constant currency basis, including approximately 7% on PokerStars.

**Key Q2 2015 and Subsequent Corporate and Other Financial Highlights**

- Since the acquisition of its B2C business on August 1, 2014, Amaya repaid approximately US$529 million of long-term debt, reducing total long-term debt from approximately US$3.134 billion to approximately US$2.605 billion.
- All previously announced B2B business divestitures were completed as of July 31, 2015 and the majority of the net proceeds were used to help repay debt and repurchase common shares.
    - Approximately US$344 million of such proceeds were used to repay outstanding long-term debt during the quarter.
    - Approximately $35.6 million of such proceeds were used to repurchase and cancel 1.1 million common shares pursuant to the Corporation's TSX-approved normal course issuer bid.
- The previously announced refinancing was completed on August 12, 2015 (the "Refinancing"), including the repayment of approximately US$590 million of the Corporation's USD second lien term loan. The Corporation funded this repayment, as well as fees and related costs, through a combination of an approximately US$315 million increase of its existing USD first lien term loan, approximately €92 million increase of its existing EUR first lien term loan and approximately US$195 million in cash.
- As a result of the Refinancing and the repayment of debt since the acquisition of its B2C business, Amaya expects that its annual interest expense will reduce by approximately US$62 million, of which approximately US$26.2 million is related to the Refinancing, thereby strengthening its cash flow generation, liquidity and leverage profile.

**2015 Full Year Financial Guidance**

> Amaya is reaffirming its previously announced 2015 full-year financial guidance provided in its earnings release on May 14, 2015 for the quarter ended March 31, 2015, with no changes to the ranges provided nor any material changes to the assumptions used to determine such guidance, except for the expected impact of approximately four and a half months' interest savings as a result of the Refinancing.
>
> (Footnotes omitted).

20. On November 10, 2015, Amaya issued a press release entitled, "Amaya Reports Third Quarter 2015 Results." Therein, the Company, in relevant part, stated:

> MONTREAL, Canada, November 10, 2015 – Amaya Inc. ("Amaya" or the "Corporation") (NASDAQ: AYA; TSX: AYA) today reported its financial results for the three and nine-month periods ended September 30, 2015. Unless otherwise noted, all references to"$" and "CAD" are to the Canadian dollar, "US$" and "USD" are to the U.S. dollar and "€" and "EUR" are to the Euro.
>
> "Since Amaya's acquisition of its B2C business, we have consistently delivered shareholder value," said David Baazov, Amaya's Chairman and CEO. "And, despite multiple recent global challenges to our core business, we believe we are well positioned to increase our cash flow and continue to grow our customer base in 2016 through a number of initiatives."
>
> **Key Q3 2015 Financial Highlights**
>
> - Revenues increased 8% to approximately $325 million as compared to pro-forma revenues for Q3 20142 of approximately $300 million. Online casino comprised approximately 14% of Q3 2015 revenues, with the remainder almost entirely from real-money online poker.
>   - Revenues grew approximately 19% on a constant currency basis and normalizing for the levy of certain value added taxes (VAT) in European Union jurisdictions in the amount of $5 million, and certain extraordinary events ("Extraordinary Events") with respect to our real-money operations in Portugal, Greece and certain additional smaller markets.
>     - The Extraordinary Events included (i) the temporary suspension of real-money operations in Portugal as of July 2015 in anticipation of a new regulatory and licensing regime, (ii) the impairment of real-money operations in Greece as a result of the severe economic slowdown in that country and the capital controls and banking restrictions imposed by its government in 2015, and (iii) the suspension of operations in approximately 30

other jurisdictions following Amaya's acquisition of the Rational Group in 2014. For Q3 2014, revenues attributable to Portugal, Greece and the other suspended jurisdictions were approximately US$9 million, the significant majority of which were from Portugal and Greece.

  - B2C poker revenues grew approximately 4.5% from Q3 2014 on a constant currency basis and normalizing for VAT and the Extraordinary Events.

- Adjusted EBITDA increased 8% to $141 million, or 43.5% of revenues, as compared to pro-forma Adjusted EBITDA for Q3 2014 of approximately $131 million, or 43.6% of revenues.
- Adjusted Net Earnings increased 13% to $91 million as compared to pro-forma Adjusted Net Earnings for Q3 2014 of approximately $80 million.

* * *

**Key Q3 2015 Operational Highlights**

- The Corporation's B2C business added an aggregate of approximately 1.85 million customer registrations during the quarter, with registered customers totalling approximately 97 million as of September 30, 2015, approximately 9% more than a year earlier.
- The aggregate number of unique customers who played a real-money online offering during the quarter was approximately 2.2 million, of which approximately 94% played on PokerStars, an approximately 3% decline from Q3 2014 driven by the impact of the Extraordinary Events.

**Key Q3 2015 and Subsequent Corporate and Other Financial Highlights**

- On September 30, 2015, the New Jersey Division of Gaming Enforcement (the "DGE") authorized Amaya to operate the PokerStars and Full Tilt brands in New Jersey. The approval follows an unprecedented review by the DGE of Amaya and its acquisition of the PokerStars and Full Tilt businesses in August 2014. Amaya anticipates initially launching in New Jersey in the first half of 2016 through its agreement with Resorts Casino Hotel in Atlantic City, New Jersey.
- Amaya was granted additional gaming licenses and approvals in Romania, Ireland, and the Province of Quebec, Canada.
- In August 2015, Amaya completed a debt refinancing (the "Refinancing") that resulted in the repayment of approximately US$590 million of the Corporation's USD second lien term loan. The Corporation funded this repayment, as well as fees and related costs, through a combination of an approximately US$315 million increase of its existing USD first lien term loan, approximately €92 million increase of its existing EUR first lien term loan and approximately US$195 million in cash.

- All previously announced B2B business divestitures were completed as of July 31, 2015 for aggregate gross cash proceeds, less transaction costs, of approximately $594 million recorded in 2015. Through these proceeds combined with cash flow generated from its continuing operations, Amaya:
    - repaid approximately $690 million of outstanding long-term debt; and
    - repurchased and canceled an aggregate of approximately 1.46 million common shares at a cost of approximately $45.5 million ($9.9 million of which were repurchased and canceled during the quarter) pursuant to its TSX-approved normal course issuer bid, which remains in effect.
- Since the acquisition of its B2C business on August 1, 2014, Amaya has reduced total long-term debt from approximately US$3.134 billion with a weighted average interest rate of 6.38% to approximately US$2.603 billion with a weighted average interest rate of 5.28%. As a result of the Refinancing and the repayment of debt, Amaya expects that its annualized interest expenses will reduce by approximately US$62 million to approximately US$136 million. The Corporation has generated approximately US$364 million in operating cash flow from continuing operations over the past 12 months.
- Amaya will today file a preliminary short form base shelf prospectus (the "Base Shelf") with the securities commissions or similar authorities in all provinces and territories in Canada and a corresponding shelf registration statement on Form F-10 (the "F-10") with the U.S. Securities and Exchange Commission (the "SEC") under the U.S.-Canada Multijurisdictional Disclosure System.
    - The Base Shelf and corresponding F-10, when made final or effective, will allow for primary and secondary offerings of up to US$3 billion of common shares, preferred shares, debt securities, subscription receipts, warrants and units, or any combination thereof, from time to time over a 25-month period. The specific terms of any offering of securities will be set forth in a shelf prospectus supplement. Amaya filed the Base Shelf and F-10 to maintain financial flexibility, including efficient access to new capital from time to time, but has no immediate intentions to undertake an offering.

21. On March 14, 2016, Amaya issued a press release entitled, "Amaya Reports Fourth Quarter and Full Year 2015 Results." Therein, the Company, in relevant part, stated:

> **MONTREAL, Canada, March 14, 2016 –** Amaya Inc. (NASDAQ: AYA; TSX: AYA) today reported financial results for the fourth quarter and year ended December 31, 2015 and provided a performance update for the first two months of 2016. Unless otherwise noted, all dollar ($) amounts are in Canadian dollars.
>
> "Throughout 2015 we successfully executed on our strategy of diversifying our operations while maintaining market dominance in poker," said David Baazov, Amaya Chairman and CEO. "Despite significant foreign exchange and product rollout challenges, we achieved positive growth on a constant

currency basis and, through investments and initiatives that will continue through 2016, have laid the foundation for becoming a leader across multiple gaming verticals."

* * *

**Fourth Quarter 2015 and Other Financial Highlights**

- **Foreign Exchange and Other Impacts on Revenues** - Excluding the impact of year-over-year changes in foreign exchange rates, total revenues for the quarter and full year would have increased by 12% and 15%, respectively, and real-money online revenues for the quarter and full year would have increased by 13% and 15%, respectively. On such constant currency basis and excluding the levy of certain value added taxes (VAT) introduced in certain European Union jurisdictions in 2015 and the previously reported suspension or impairment of real-money operations in Portugal, Greece and certain other jurisdictions, total revenues for the quarter and full year would have increased by 16% and 19%, respectively, and real-money online revenues for the quarter and full year would have increased by 17% and 19%, respectively. Approximately US$6.8 million of revenues for the quarter and full year were the result of accounting adjustments for certain offsets to gross gaming revenue.
- **Operating Segment Revenues** - Real-money online poker revenues and real-money online casino and sportsbook combined revenues represented approximately 78% and 17% of total revenues for the quarter, respectively, as compared to 93% and 3%, respectively, for the fourth quarter of 2014. Other offerings, including social and play-money gaming, live poker events, branded poker rooms and daily fantasy sports, and other nominal sources of revenue are aggregated into other revenues, which comprise the remaining portion of total revenues for the periods.
- **Adjusted Net Leverage Ratio** - Adjusted Net Leverage Ratio at December 31, 2015 was 5.07.
- **Debt** – During the year Amaya reduced total long-term debt from approximately US$3.156 billion with a weighted average interest rate of 6.38% to approximately US$2.587 billion with a weighted average interest rate of 5%. Amaya expects interest and debt principal payments to be approximately US$173 million in 2016.

**Fourth Quarter 2015 Operational Highlights**

- **Customer Registrations** - Aggregate customer registrations increased by 1.99 million to approximately 99 million at the end of 2015 and currently exceed 100 million.
- **Quarterly Real-Money Active Uniques (QAUs)** – Total combined QAUs were 2.4 million, a decrease of approximately 2.3% year-over-year, and PokerStars only QAUs were 2.3 million, an increase of approximately 0.6% year-over-year. Excluding the impact of the suspension or impairment of

certain real-money operations noted above, total combined QAUs would have increased approximately 0.9%, and PokerStars only QAUs would have increased approximately 4.1%. Approximately 95% of total combined QAUs played on PokerStars. Amaya estimates that its emerging online casino offerings are already among the world's fastest growing and have one of the largest player bases among its competitors.

- **Quarterly Net Yield (QNY)** – Total QNY was $153, an increase of 16.8% year-over-year. Total QNY on a U.S. dollar basis was US$113, a decrease of 2.4% year-over-year. Excluding the impact of year-over-year changes in foreign exchange rates, total QNY was US$134, an increase of 15.2% year-over-year. On such constant currency basis and excluding the levy of certain VAT and the suspension or impairment of certain real-money operations noted above, total QNY on a U.S. dollar basis increased by 13.5% year-over-year.

**2016 Performance Update**

- **Revenues** – For the first two months of 2016, Amaya estimates that unaudited consolidated revenues were approximately US$189 million, representing an increase of approximately 4% over the same period of 2015. Of such revenues, 75% was attributable to real-money online poker estimated revenues and 21% was attributable to real-money online casino and sportsbook combined estimated revenues. Excluding the impact of year-over-year changes in foreign exchange rates, Amaya estimates that such revenues were approximately US$208 million, representing an increase of approximately 14% over the same period of 2015.
- **2016 Guidance** – As previously announced, the Special Committee of the Board of Directors determined, in consultation with the Audit Committee of the Board of Directors, that in view of the potential offer to acquire Amaya that may be forthcoming from Mr. Baazov, and the fact that the Special Committee's financial advisor and the independent valuator have commenced their review process, it would be inappropriate for Amaya to provide guidance with respect to its 2016 financial performance at this time. An analysis of management's forecast of Amaya's financial performance will be part of the valuator's work, and its report, which would include certain forecast information, would be made public as part of any disclosure document relating to an offer, if any, from Mr. Baazov. Amaya is not otherwise precluded from providing 2016 financial guidance in the future.

22. The above statements contained in ¶¶17-21 were false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, these statements were false and/or misleading statements and/or failed to disclose: (1) that the Company's CEO was engaged in an insider trading scheme that involved

influencing the market price of the Company's securities and communicating privileged information to third parties; (2) the Company lacked adequate internal controls; and, (3) that, as a result of the foregoing, Defendants' statements about Amaya's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

23. On March 23, 2016, news outlets reported that Amaya's CEO, David Baazov, was charged with insider trading by Quebec securities regulators. Bloomberg Business reported that the charges included "allegations of 'aiding with trades while in possession of privileged information,' influencing or attempting to influence the market price of securities of Amaya, and communicating privileged information . . . ."

24. On this news, Amaya's stock fell $3.07 per share, or more than 21%, to close at $11.18 per share on March 23, 2016, on unusually heavy trading volume.

**CLASS ACTION ALLEGATIONS**

25. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Amaya's securities between June 8, 2015 and March 22, 2016, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

26. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Amaya's securities were actively traded on the NASDAQ Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff

believes that there are hundreds or thousands of members in the proposed Class. Millions of Amaya shares were traded publicly during the Class Period on the NASDAQ. As of December 31, 2015, Amaya had 133,426,193 common shares outstanding. Record owners and other members of the Class may be identified from records maintained by Amaya or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

28. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Amaya; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

30. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

31. The market for Amaya's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Amaya's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Amaya's securities relying upon the integrity of the market price of the Company's securities and market information relating to Amaya, and have been damaged thereby.

32. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Amaya's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Amaya's business, operations, and prospects as alleged herein.

33. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Amaya's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants'

materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

34. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

35. During the Class Period, Plaintiff and the Class purchased Amaya's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

36. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Amaya, his/her control over, and/or receipt and/or modification of Amaya's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Amaya, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

37. The market for Amaya's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Amaya's securities traded at artificially inflated prices during the Class Period. On June 23, 2015, the Company's stock closed at a Class Period high of $29.91 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Amaya's securities and market information relating to Amaya, and have been damaged thereby.

38. During the Class Period, the artificial inflation of Amaya's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Amaya's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Amaya and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

39. At all relevant times, the market for Amaya's securities was an efficient market for the following reasons, among others:

(a) Amaya stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Amaya filed periodic public reports with the SEC and/or the NASDAQ;

(c) Amaya regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

(d) Amaya was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

40. As a result of the foregoing, the market for Amaya's securities promptly digested current information regarding Amaya from all publicly available sources and reflected such information in Amaya's stock price. Under these circumstances, all purchasers of Amaya's securities during the Class Period suffered similar injury through their purchase of Amaya's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

41. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Amaya who knew that the statement was false when made.

## FIRST CLAIM
## Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

42. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

43. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Amaya's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

44. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Amaya's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

45. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Amaya's financial well-being and prospects, as specified herein.

46. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Amaya's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Amaya and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

47. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

48. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Amaya's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

49. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Amaya's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Amaya's securities during the Class Period at artificially high prices and were damaged thereby.

50. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other

members of the Class and the marketplace known the truth regarding the problems that Amaya was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Amaya securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

51. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

52. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of
## The Exchange Act Against the Individual Defendants

53. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54. The Individual Defendants acted as controlling persons of Amaya within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

55. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

56. As set forth above, Amaya and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 4, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
13650 Marina Pointe Dr. Ste. 1404
Marina Del Rey, CA 90292
Telephone: 800-977-7401
Fax: 800-536-0065
Email: michael@goldberglawpc
brian@goldberglawpc

***Attorneys for Plaintiff***

# Plaintiff's Certification

I, Michael Neuberger, certify that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff’s transactions in the security that is the subject of the complaint during the class period specified in the complaint are as follows:

I bought 750 shares on 06/12/2015 at $26.50

5. Plaintiff has not sought to serve, or served, as a representative party on behalf of a class under this title during the 3-year period preceding the date on which this certification is signed, except as follows:

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/28/2016

**AMAYA, INC. (AYA)** **Neuberger, Michael**

**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 6/12/2015 | Purchase | 750 | $26.5000 |